# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ ) | |
| **ALANTRA LLC,** ) | |
| ) | |
| **Plaintiff and** ) | |
| **Counterclaim-Defendant,** ) | **Civil Action No.** |
| ) | **20-10852-FDS** |
| **v.** ) | |
| ) | |
| **APEX INDUSTRIAL TECHNOLOGIES LLC,** ) | |
| ) | |
| **Defendant and** ) | |
| **Counterclaim-Plaintiff.** ) | |
| _____ ) | |

## MEMORANDUM AND ORDER ON PARTIES'
## CROSS-MOTIONS FOR SUMMARY JUDGMENT

**SAYLOR, C.J.**

This is an action arising out of a contract dispute. Plaintiff Alantra LLC entered into a

contract with defendant Apex Industrial Technologies LLC to serve as Apex's exclusive

financial advisor in connection with its efforts to raise capital and attract outside investment.

The terms of that agreement were executed in an Engagement Letter, signed by both parties.

The Engagement Letter contained contingent-compensation provisions whereby Alantra

was to be paid a transaction fee for debt-financing or equity-capital transactions that involved

Apex. According to the complaint, during the course of the agreement, Alantra identified a

company, Fastenal, as a potential strategic investor for Apex; however, Apex instructed Alantra

not to pursue Fastenal as an investor. Not long thereafter, Apex entered into an asset-purchase

agreement with Fastenal for $125 million. Alantra then sought a transaction fee in connection

with that sale, but Apex declined to pay the fee, asserting that the transaction was not one for

which Alantra was entitled to compensation under the terms of the agreement.

Alantra then sued Apex for breach of contract and unjust enrichment.  In its answer, Apex asserted counterclaims for breach of contract and breach of fiduciary duty, alleging that Alantra disclosed confidential information by publicly filing the complaint and attaching the Engagement Letter as an exhibit.

The parties have cross-moved for summary judgment.  Alantra has moved for summary judgment on its breach of contract claim as well as Apex's counterclaims, and Apex has moved for summary judgment as to liability on all claims and counterclaims.

There are two principal issues before the Court.  The first is whether the Engagement Letter requires Apex to pay Alantra a contingent fee for a transaction involving the sale of assets, as opposed to a debt-financing or equity-capital transaction.  The Court concludes that the unambiguous terms of the Engagement Letter, read as a whole, demonstrate that it does not.  The second is whether there is a genuine dispute of material fact concerning the existence of damages resulting from the alleged disclosure of confidential information by Apex.  The Court concludes that there is.

Accordingly, and for the following reasons, the motions will be granted in part and denied in part.

I.   **Background**

  A.   **Factual Background**

Alantra LLC is a Massachusetts investment-banking firm that provides business advice to clients by identifying potential sources of funding and investment.  (Emery Dep. at 24-25).  Apex Industrial Technologies LLC is an Ohio company that provides supply-chain products and technologies.  (Savage Decl. ¶ 1).

In 2019, Apex began seeking outside investment to raise capital for the company.

2

(Savage Dep. at 41-42; Emery Dep. at 39-40).  To that end, it enlisted the services of Alantra to identify and attract outside investors.  (Savage Dep. at 40-42, 46).

In June 2019, the parties executed a nondisclosure agreement and began to negotiate the terms of an agreement.  (Savage Decl. ¶ 4; Savage Dep. at 50-51, 122-23).  On August 13, the parties finalized the agreement in an engagement letter (the "Engagement Letter").

### 1.     The Engagement Letter

#### a.     Alantra's Obligations Under the Letter

According to the Engagement Letter, Apex appointed Alantra to act as its "exclusive financial advisor in connection with its contemplated debt and/or equity capital raising (the "Assignment")."  (Engagement Letter at 1).  Alantra was to assist Apex by providing advice as to market conditions, identifying potential sources of investment, conducting due diligence, and evaluating proposed transactions.  (*Id.* ¶ 1.1).  For example, the letter states that Alantra was expected to assist in "[e]xamining the market for potential lenders and investors and identifying a universe of parties who should be contacted in relation to the proposed transaction (the "Investors")."  (*Id.*).  Similarly, the letter states that Alantra was expected to assist in "[g]athering and analyzing information relevant to the market and the proposed transaction." (*Id.*).

The Engagement Letter limited Alantra's duties to those expressly stated in the letter:

> The only duties or obligations Alantra owes [Apex] in relation to the Assignment are those set out expressly in this letter[.]  Alantra does not owe [Apex] any other or further duties or obligations (whether arising from the fact that Alantra is acting as your adviser or otherwise) in relation to the Assignment.

(*Id.* ¶ 8.1).

#### b.     Fee Provisions

The Engagement Letter required that Apex pay an initial $20,000 retainer to Alantra,

followed by up to four monthly payments of $15,000.  (*Id.* ¶ 2.1).  Those fees were labeled

"Professional Fees" and were "non-cancelable and payable in full" regardless of whether the

agreement was terminated.  (*Id.*).  However, the Professional Fees could be credited against any

obligation to pay a "Transaction Fee," as long as that fee exceeded $750,000.  (*Id.* ¶¶ 2.1, 2.3).

The Engagement Letter defined "Transaction Fee" and "Transaction" as follows:

> The contingent portion of Apex's obligation under this Assignment is the
> "Transaction Fee" which is paid in connection with any debt financing or equity
> capital raise (except by or from Kent Savage [Apex's President and CEO], or one
> o[r] more of his affiliates) (a "Transaction") that involves Apex including current
> vendors and customers of [Apex] provided that any credit accommodations,
> account adjustments, payment arrangements, forbearances, waivers, or other
> allowances of any kind by any such vendors or customers shall not be deemed to
> be a Transaction.

(*Id.* ¶ 2.2).

The letter then set forth two methods for calculating a "Transaction Fee," depending on

the circumstances of the transaction at issue.  The first was as follows:

> The Transaction Fee is computed upon the closing (the "Closing") and, for all
> Transactions for which Alantra is entitled to a Transaction Fee pursuant to this
> engagement letter, the Transaction Fee(s), in the aggregate, will be equal to the
> greater of $750,000 (the "Minimum Fee") or the following:
>
> - 2.75% of the first $20 million of 1st lien debt and 2.5% thereafter; plus
> - 5% of the amount raised in equity, subordinated debt or mezzanine from
>   Investors on the first $10 million; 4.5% on the next $10 million and 4%
>   thereafter.
>
> Alantra's Transaction Fee shall be payable with respect to all Investors (other than
> Kent Savage and any of his affiliates), provided that with respect to any Investor
> designated by [Apex] on the attached Annex A (the "Designated Investors"), the
> Transaction Fee(s) payable by Apex with respect to a debt or equity capital raise
> by or from any Designated Investors will be reduced by 50% provided the term
> sheet is fully executed 45 days from the execution of this engagement letter
> further provided that in no event will the discounted Transaction Fee(s) for all
> such loans or capital raises by or from any Designated Investors be less than
> $600,000. . . .  Further, [Apex] shall not have the right to include any additional
> Designated Investors during the term of the engagement beyond those identified
> in Annex A upon execution of the engagement letter.

4

(*Id.* ¶ 2.3).

The second calculation method concerned larger transactions:

> In the event that [Apex] elects to raise capital or sell shares that results in a transfer of greater than 50% of the current fully diluted shares, then in lieu of, and not in addition to, the Transaction Fees provided for in Paragraph 2.3, Alantra shall be entitled at the Closing to the Transaction Fees as outlined below:
>
> - 2.0% of the Transaction Value up to $100 million, plus
> - 2.5% of the Transaction Value above $100 million.
>
> For the purpose of this letter, the term "Transaction Value" shall mean the Enterprise Value on a cash free and debt free basis.  For the avoidance of doubt, Enterprise Value shall mean the aggregate of any amounts paid or committed for stock or assets plus the value of all net interest bearing debt, including the value of any debt like items, assumed by the buyer, plus any current assets retained by the seller on or after the date hereof as part of the consideration.  The Transaction Value for any Transaction (including a recapitalization) that involves more than 50% of the equity voting rights or results in a change of control will be equal to the implied Enterprise Value for 100% of the stock or assets.

(*Id.* ¶ 2.4).

The Engagement Letter also contained two "tail" provisions that required payment of a contingent fee, under certain circumstances, after a transaction closed, or even after the expiration of the Engagement Letter.  The first of those provisions concerned subsequent investments to transactions executed during the agreement period:

> Provided there is a Closing and additional debt or equity is raised or invested, as the case may be, in the 12 months from Closing by an Investor or Designated Investor which participated in a debt financing or equity capital raise for which Alantra is entitled to a Transaction Fee pursuant to the terms of this engagement letter, Alantra would be entitled to an additional Transaction Fee as outlined in Paragraph 2.3 or 2.4, as the case may be, on the additional debt financing or capital raise by or from such Investor or Designated Investor (the Minimum Fee shall not apply).

(*Id.* ¶ 2.5).

The second provision concerned transaction fees incurred after the expiration of the agreement:

Alantra shall be entitled to receive a Transaction Fee(s) in the event that any time prior to the expiration of twelve (12) months from the expiration or earlier termination of this engagement letter a Transaction as to which Alantra otherwise would be entitled to a Transaction Fee but for the expiration or earlier termination of this engagement letter is consummated by Apex with any party: (a) contacted by Alantra or Apex pursuant to this engagement letter; (b) was in contact with Apex prior to or during the term of this engagement letter and signs a non-disclosure agreement; (c) that is included on Annex B of previously contacted investors or (d) that Alantra identified as a potential investor, but was instructed by Apex not to contact.

(*Id.* at ¶ 2.9).

### c.    **Confidentiality Provisions**

The Engagement Letter also contained terms obligating Alantra to preserve the confidentiality of sensitive information provided by Apex.  (*Id.* ¶¶ 3.1-3.2).  Under those terms, Alantra was required not to disclose any confidential information concerning Apex without prior written consent.  (*Id.* ¶ 3.2).  The letter stated that such confidential information included "the existence and terms of [the] engagement letter, the Assignment, and any and all negotiations with prospective investors."  (*Id.*).  That obligation continued even after the expiration or termination of the agreement.  (*Id.* ¶ 6.2).

### 2.    **Sale to Fastenal**

In September 2019, Alantra Vice President Christopher Dubyak e-mailed Apex CEO Kent Savage a list of potential investors to "add to the outreach process."  (Docket No. 74, Ex. 22 ("September 2019 E-mails") at 3).  Listed among Dubyak's list of "Tier I" new strategic investors was Fastenal Company.  (*Id.* at 4).  The e-mail acknowledged that Apex had earlier instructed Alantra to not contact specific companies previously identified as potential investors; with respect to the new list of investors, Dubyak asked, "Can you please confirm and let us know if there is sensitivity with any of the other names [on the list]?"  (*Id.* at 3).  Savage responded,

We SHOULD DEFER all of the prospective strategic players.  We currently have commercial relationships with a number of companies on this list (both tier 1 and

tier 2).  It will be more likely to engage this type of player when we are a few
quarters further down our success track.

(*Id.* at 2).  Alantra did not further pursue Fastenal as a potential investor in Apex.

On December 31, 2019, according to the terms of the Engagement Letter, the agreement
between Alantra and Apex expired.  However, both companies appeared to have continued a
working relationship, albeit in a limited capacity.  For example, on February 20, 2020, Kent
Savage sent an e-mail to Alantra asking for a review of its updated "CIM"—ostensibly a
Confidential Information Memorandum used to attract new investors.  (Docket No. 74, Ex. 7
("February 2020 E-mail")).  There is no evidence, though, that Apex asked for Alantra's
assistance with, or that Alantra assisted in, any negotiations with Fastenal.

On March 30, 2020, Apex and Fastenal executed an Asset Purchase Agreement (the
"Fastenal APA"), whereby Apex sold certain assets related to its maintenance, repair, and
operations business in return for $125 million.  (Docket No. 70, Ex. 8 ("Asset Purchase
Agreement") at 6-7).  According to the Form 10-Q Fastenal filed with the Securities and
Exchange Commission, Fastenal purchased $123.8 million in intangible assets and $1.2 million
in tangible assets.  (Docket No. 74, Ex. 14 at 3).

Alantra learned of the proposed deal and requested payment of a transaction fee
according to the terms of the Engagement Letter.  (Docket No. 70, Ex. 10 ("March 2020 E-
mail")).  Apex concluded that the asset sale to Fastenal was not a qualifying transaction under
the Engagement Letter and declined to pay the requested transaction fee.  (Savage Dep. at 268-
69).

### 3.    Alleged Disclosure of Confidential Information

On May 5, 2020, Alantra sued Apex to recover the transaction fee that it contends is
owed for the Fastenal APA.  (Compl.).  In its filings, Alantra attached to its complaint a copy of

the Engagement Letter and its associated annexes.  Apex then filed counterclaims, alleging that the public filing of the Engagement Letter and the inclusion of certain allegations in the complaint breached its confidentiality provisions.  According to Savage, "Apex already has been, and will continue to be, damaged by Alantra's disclosure of Apex's confidential information, including damage to its industry reputation, its competitive advantage in connection with the pursuit of new business, and its current and future investment campaigns."  (Savage Decl. ¶ 10). Apex has not otherwise provided proof of lost business opportunities resulting from the disclosure of information in this suit.

**B.** **Procedural Background**

The complaint alleges two causes of action:  Count 1 alleges a breach of contract for Apex's failure to pay a transaction fee for the Fastenal APA, and Count 2 alleges unjust enrichment for uncompensated services rendered by Alantra.

Apex answered with two counterclaims:  Counterclaim 1 alleges a breach of contract for the disclosure of confidential information, and Counterclaim 2 alleges a breach of fiduciary duty for the same.

Both parties have moved for summary judgment.  Alantra has moved for summary judgment on its breach-of-contract claim, as well as Apex's counterclaims.  Apex has moved for summary judgment as to liability on all claims and counterclaims.

For the following reasons, summary judgment will be granted in favor of Apex as to Alantra's claims for breach of contract and unjust enrichment (to the extent it concerns services provided in furtherance of the Fastenal APA); granted in favor of Alantra as to Apex's counterclaim for breach of fiduciary duty; and denied as to Apex's counterclaim for breach of contract.

## II.   <u>Legal Standard</u>

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)).  Summary judgment shall be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990) (citation omitted).  In evaluating a summary judgment motion, the court indulges all reasonable inferences in favor of the nonmoving party.  *See O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir. 1993).  When "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quotations omitted).  The nonmoving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence." *Id.* at 256-57.

## III.   <u>Analysis</u>

### A.   <u>Count 1:  Breach of Contract—Transaction Fee</u>

The Engagement Letter provides that it is "governed by and is to be construed in accordance with the laws of the State of New York." (Engagement Letter ¶ 8.2).[1]  Under New

---

[1] Federal courts sitting in diversity are obliged to apply the conflict-of-laws rules of the state where the court resides.  *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).  "Where, as here, the parties have expressed a specific intent as to the governing law, Massachusetts courts will uphold the parties' choice as long as the result is not contrary to public policy."  *Oxford Global Resources, LLC v. Hernandez*, 480 Mass. 462, 468 (2018) (internal quotation marks omitted).  The parties have not objected to the application of New York law.

York law, to prove a claim for breach of contract, a plaintiff must show (1) the formation of a contract, (2) performance under that contract by plaintiff, (3) breach of that contract by defendant, and (4) resulting damage.  *See McCormick v. Favreau*, 919 N.Y.S.2d 572, 577 (App. Div. 2011).  When interpreting a contract, a court endeavors to "give effect to the intent of the parties as revealed by the language of their agreement."  *Chesapeake Energy Corp. v. Bank of N.Y. Mellon Trust Co., N.A.*, 773 F.3d 110, 113-14 (2d Cir. 2014) (quoting *Compagnie Financiere de CIC et de L'Union Europeene v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 232 F.3d 153, 157 (2d Cir. 2000)).  "The words and phrases in a contract should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions."  *Id.* (internal alterations omitted) (quoting *Olin Corp. v. American Home Assurance Co.*, 704 F.3d 89, 99 (2d Cir. 2012)).

Summary judgment is appropriate on a breach-of-contract claim if "the terms of the contract are unambiguous."  *Fisher & Mandell, LLP v. Citibank, N.A.*, 632 F.3d 793, 799 (2d Cir. 2011).  The terms of a contract are unambiguous "where the contract language has a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion."  *Chesapeake Energy Corp.*, 773 F.3d at 114 (internal alterations and quotation marks omitted) (quoting *Law Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010)).  When the contract language is unambiguous, "the intent of the parties must be found within the four corners of the contract."  *Id.* (internal alterations omitted) (quoting *Howard v. Howard*, 292 A.D.2d 345, 345 (App. Div. 2002)).  By contrast, a contract is ambiguous if its terms "could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs,

10

practices, usages, and terminology as generally understood in the particular trade or business."
*Id.* (quoting *Law Debenture Tr. Co. of N.Y.*, 595 F.3d at 466).

The parties do not dispute, for purposes of summary judgment, that the Engagement Letter constituted a contract between the parties; that the Fastenal APA was executed within the twelve-month period in which the tail provision of Paragraph 2.9 applied; and that Alantra identified Fastenal as a potential strategic investor during the period covered by the Engagement Letter. The dispositive issue, then, is whether the Fastenal APA was the type of transaction contemplated by the Engagement Letter such that Alantra was entitled to a transaction fee upon the closing of that agreement.

Alantra contends that the asset sale to Fastenal was a compensable transaction under Paragraph 2.4, notwithstanding the Engagement Letter's primary focus on debt-financing and equity-capital transactions. According to Alantra, Paragraph 2.4 is a broad provision that expands the universe of compensable transactions contemplated by the agreement.

Whether Alantra was entitled to a transaction fee depends, of course, upon whether the Fastenal APA was a transaction within the meaning of the Engagement Letter. According to the terms of that letter, it was not.

To begin, the terms "Transaction" and "Transaction Fee" are defined in Paragraph 2.2, which states that "[t]he contingent portion of Apex's obligation under this Assignment is the 'Transaction Fee,' which is paid in connection with any debt financing or equity capital raise (except by or from Kent Savage, or one o[r] more of his affiliates) . . . that involves Apex . . . ." (Engagement Letter ¶ 2.2). The parties do not dispute that the Fastenal APA was not a "debt financing" or an "equity capital raise." That alone appears dispositive.

Alantra contends that while Paragraph 2.3 governs payment of a fee in connection with

"debt financing" or "equity capital raise" transactions, Paragraph 2.4 is a broader provision that encompasses transactions not otherwise contemplated in the Engagement Letter.  Again, that paragraph provides that "[i]n the event that [Apex] elects to raise capital or sell shares that results in a transfer of greater than 50% of the current fully diluted shares, then in lieu of, and not in addition to, the Transaction Fees provided for in Paragraph 2.3, Alantra shall be entitled" to certain additional fees based on the "Transaction Value."

> It goes on to define "Transaction Value" as follows:

> For the purposes of this letter "Transaction Value" shall mean the Enterprise Value on a cash free and debt free basis.  For the avoidance of doubt, Enterprise Value shall mean the aggregate of any amounts paid or committed for stock or assets plus the value of all net interest bearing debt, including the value of any debt like items, assumed by the buyer, plus any current assets retained by the seller on or after the date hereof as part of the consideration.  The Transaction Value for any Transaction (including a recapitalization) that involves more than 50% of the equity voting rights or results in a change of control will be equal to the implied Enterprise Value for 100% of the stock or assets.

(*Id.* ¶ 2.4).

Alantra's interpretation of Paragraph 2.4 rests upon two premises.  The first is that the limiting phrase, "that results in a transfer of greater than 50% of the current fully diluted shares," applies to only the selling of shares and not the raising of capital.  Thus, according to Alantra's interpretation, all transactions that "raise capital," no matter the amount raised, fall within the ambit of Paragraph 2.4.

The second premise is that an asset sale is a transaction that "raise[s] capital."  Alantra reasons that the definition of "Enterprise Value" includes "any amounts paid or committed for stock or assets"; that "Transaction Value" is defined as being largely synonymous with "Enterprise Value"; that a "Transaction Value" serves as the basis for determining the "Transaction Fee" under Paragraph 2.4; that the value of the transaction thus corresponds to the nature of the transaction; and, therefore, if the "Transaction Value" is in some way affected by

funds "paid or committed for stock or assets," then a sale of assets must be one of the transactions contemplated by the fee provision of Paragraph 2.4.

There are several problems with that proposed interpretation. The first is that it conflicts with the definition of "Transaction" set forth in Paragraph 2.2, which limits the payment of fees to transactions involving "debt financing" or an "equity capital raise." Generally, "a word used by the parties in one sense will be given the same meaning throughout the contract in the absence of countervailing reasons." *Two Farms, Inc. v. Greenwich Ins. Co.*, 993 F. Supp. 2d 353, 362 (S.D.N.Y. 2014) (quoting *Iroquois Master Fund, Ltd. v. Quantum Fuel Sys. Techs. Worldwide Inc.*, 2013 WL 4931649, at *2 (S.D.N.Y. Sept. 12, 2013)). Alantra's intricate and attenuated interpretation is unreasonable when the term at issue is clearly defined and is otherwise used consistently throughout the contract.

Alantra's proposed interpretation also fails because it attempts to locate the meaning of "Transaction" in an exegesis of the terms "Transaction Value" and "Enterprise Value." However, those terms define a method for determining the value of a transaction, not the nature of the transaction itself. In other words, simply because the Engagement Letter calls for assessing the assets involved in a transaction to calculate the transaction fee does not mean that asset sales are qualifying transactions. The Engagement Letter was a business contract executed by sophisticated parties; had the parties intended for it to include asset sales as a kind of compensable transaction, the Engagement Letter could have stated as much. The terms of the agreement, at least to the extent that they define the term "transaction," are simple and unambiguous.

Moreover, Alantra's interpretation of the first sentence of Paragraph 2.4 would produce absurd results. If the limiting phrase ("that results in a transfer of greater than 50% of fully

diluted shares") does not apply to both of the parallel predicates ("raise capital" and "sell shares"), that means that there is no limitation on the term "raise capital"—even though the remainder of the paragraph describes transactions where company control is at stake.  Alantra reads the limiting phrase to apply only to the sale of stock, making any asset sale, no matter its size, the basis of a transaction fee.  Thus, under Alantra's interpretation of the contract, if Apex had sold Fastenal some office furniture for $5,000, Alantra would be owed a $100 fee.  (Apex's Opp'n at 16).  That and other similarly quotidian transactions would be governed by the same provision that governed transactions that alter ownership and control of the entire company.  Such an interpretation, in context, is unreasonable.[2]

The Engagement Letter, when read as a whole, sets forth an agreement whereby Apex enlists Alantra's advice on debt financing and equity-capital raising.  The Engagement Letter preamble and Paragraph 1.1 limit Alantra's role as advisor to those transactions and evince a general focus on investment; they do not suggest that Alantra would facilitate an asset-sale agreement.  The transaction fee provisions in Paragraphs 2.2 and 2.3 reemphasize that focus.  Indeed, nowhere in the Engagement Letter is there any mention of asset-purchase agreements or raising capital through means other than debt financing or the raising of equity capital.

"[I]t is important for the court to read the integrated agreement 'as a whole.'"  *Global Reinsurance Corp. of Am. v. Century Indemnity Co.*, 22 F.4th 83, 95 (2d Cir. 2021) (quoting *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011)).  "If the document as a whole 'makes clear the parties' over-all intention, courts examining isolated

---

[2] Alantra argues that Apex conflates the meaning of "raise capital" and "sell shares" when it applies the limiting phrase "that results in a transfer of greater than 50% of fully diluted shares" to both predicates.  According to to Alantra, "raise capital" and "sell shares" would then be redundant, as both would entail the transfer of shares.  However, selling shares is but one way to "transfer" them to another party.  And given the complexity of financial arrangements that "raise capital" without the express, or at least the immediate, selling of shares (for example, the issuance of warrants), applying the limiting phrase to each predicate does not render them redundant.

provisions should then choose that construction which will carry out the plain purpose and object of the agreement.'" *Id.* (quoting *Lockheed Martin*, 639 F.3d at 69)).  Here, the contract makes clear that Apex engaged Alantra to serve as a financial advisor to help generate outside investment in the company.  It also provides for the payment to Alantra of fees for securing debt servicing and raising equity capital.  It does not, however, provide for transaction fees for asset-purchase agreements executed by Apex.

Finally, Alantra contends that an interpretation of the Engagement Letter that forecloses the possibility of payment of a transaction fee for an asset sale is contradicted by extrinsic evidence.  Alantra points to testimony from its representatives stating that Paragraph 2.4 was crafted to cover transactions that were "not [the] primary focus" of the agreement, but for which Alantra wanted to be compensated.  (Emery Dep. at 66).  It contends that the inclusion of Paragraph 2.4 was "a requirement" for Alantra to agree to the terms of the Engagement Letter. (Hadfield Dep. at 69).  Alantra does not, however, identify any actual ambiguity in the contract, which is the necessary predicate for considering extrinsic evidence.  "[W]hile 'interpretation' evidence is not barred by the parol evidence rule if an ambiguity is shown, merely labeling evidence as being offered to 'interpret' a contract does not relieve a party from showing that the contract is ambiguous." *Wilder v. World of Boxing LLC*, 220 F. Supp. 3d 473, 481 (S.D.N.Y. 2016).

Accordingly, summary judgment will be granted for defendant as to Count 1.

## B.    Count 2:  Unjust Enrichment

To prove a claim for unjust enrichment, a plaintiff must show "(1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge by the defendant of the benefit; and (3) acceptance or retention by the defendant of the benefit under the circumstances would be inequitable without payment for its value." *Tomasella v. Nestle USA, Inc.*, 962 F.3d

60, 82 (1st Cir. 2020) (quoting *Massachusetts Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.*, 552 F.3d 47, 57 (1st Cir. 2009)).[3]  Unjust enrichment is "an equitable remedy, and it is a basic doctrine of equity jurisprudence that courts of equity should not act . . . when the moving party has an adequate remedy at law." *Foley v. Yacht Mgmt. Grp.*, 2011 WL 4020835, at \*8 (D. Mass. Sept. 9, 2011) (internal quotation marks and citation omitted) (quoting *Massachusetts v. Mylan Laboratories*, 357 F.Supp.2d 314, 324 (D. Mass. 2005)).  "[T]he existence of a contractual relationship between the parties typically precludes an unjust enrichment claim arising out of that contract." *Biltcliffe v. CitiMortgage, Inc.*, 772 F.3d 925, 931 (1st Cir. 2014).  However, a party can plead alternative causes of action for breach of contract and unjust enrichment "where there is a dispute over the existence, scope, or enforceability of the putative contract." *Grossman v. Geico Cas. Co.*, 2022 WL 1656593, at \*3 (2d Cir. May 25, 2022) (quoting *Reilly v. Natwest Mkts. Grp. Inc.*, 181 F.3d 253, 263 (2d Cir. 1999)).

Under the circumstances, the unjust-enrichment claim based upon services provided in furtherance of the Fastenal APA is precluded by the existence of the contract.  The parties do not dispute that the Engagement Letter is an enforceable contract.  "Massachusetts law does not allow litigants to override an express contract by arguing unjust enrichment." *Plastic Surgery Assocs., S.C. v. Cynosure, Inc.*, 407 F. Supp. 3d 59, 83 (D. Mass. 2019) (quoting *Platten v. HG Bermuda Exempted Ltd.*, 437 F.3d 118, 130 (1st Cir. 2006)).  "It is the availability of a remedy at

---

[3] It is not entirely clear (and the parties do not raise the issue) whether the choice-of-law provision in the Engagement Letter would apply to plaintiff's equitable claim for unjust enrichment—particularly given that the choice-of-law provision applies only to the contract itself.  *See Dinan v. Alpha Networks, Inc.*, 764 F.3d 64, 69 (1st Cir. 2014) (holding that choice-of-law provision in contract did not apply to quasi-contract claim).  Nevertheless, "[t]he first step in a choice of law analysis is to determine whether an actual conflict exists between the substantive laws of the interested jurisdictions . . . ." *Reicher v. Berkshire Life Ins. Co. of Am.*, 360 F.3d 1, 4 (1st Cir. 2004).  In this case, "the elements of unjust enrichment are substantially similar in New York and Massachusetts." *Fine v. Guardian Life Ins. Co. of Am. & Park Ave Sec., LLC*, 450 F. Supp. 3d 20, 34 (D. Mass. 2020).  Therefore, the Court "need not make a finding regarding which state's law is to be applied where the case's resolution would be identical under either state's law." *Id.* at 34-35 (quoting *Fratus v. Republic W. Ins. Co.*, 147 F.3d 25, 28 (1st Cir. 1998)).

law, not the viability of that remedy, that prohibits a claim for unjust enrichment." *Id.* (quoting *Shaulis v. Nordstrom, Inc.*, 865 F.3d 1, 16 (1st Cir. 2017)).

The complaint alleges that Alantra is owed a transaction fee for the Fastenal APA. (Compl. ¶¶ 30-31).  But, as discussed, the Fastenal APA was not a transaction covered by the Engagement Letter such that Apex was contractually obligated to pay Alantra a transaction fee. The issue, then, is whether the services Alantra provided to Apex concerning the Fastenal APA were contemplated by the contract (and therefore subject to the contract's compensation provisions) or were services provided aside from Alantra's contractual obligations that resulted in Apex being unjustly enriched.

Alantra identified Fastenal to Apex as a potential strategic investor as part of its duties under the Engagement Letter.  (*See* September 2019 E-mails at 4).  Thus, any compensation Alantra should have received for providing that information was governed by the terms of the Engagement Letter, and any relief Alantra seeks for those services must be pursued through a claim for breach of contract.

Accordingly, to the extent that plaintiff seeks compensation for services provided in furtherance of the Fastenal APA, summary judgment will be granted for defendant as to Count 2.

There appears to be evidence that Alantra provided services to Apex after the expiration of the contract that did not involve the Fastenal transaction.  It is therefore possible that Alantra may be entitled to compensation for those services to avoid unjust enrichment.  To the extent that plaintiff is seeking damages arising out of the provision of those services, summary judgment will be denied.

### C. <u>Counterclaims 1 and 2—Disclosure of Confidential Information</u>

Apex asserts two counterclaims, both of which concern the alleged disclosure of confidential information—specifically, the disclosure of certain of Apex's business dealings in

17

the complaint and the attachment of the Engagement Letter as an exhibit to the complaint.
Counterclaim 1 alleges a breach of contract.  Counterclaim 2 alleges a breach of fiduciary duty.
Apex requests both damages and preliminary and permanent injunctive relief.

Again, to prove a claim for breach of contract, a plaintiff must show (1) the formation of
a contract, (2) performance under that contract by plaintiff, (3) breach of that contract by
defendant, and (4) resulting damage.  *See McCormick*, 919 N.Y.S.2d at 577.

To prove a claim for breach of fiduciary duty, a plaintiff must show (1) the existence of a
fiduciary relationship, (2) misconduct by the fiduciary, and (3) damages that were directly
caused by the fiduciary's misconduct.  *See Kurtzman v. Bergstol*, 835 N.Y.S.2d 644, 646 (App.
Div. 2007).

Apex contends that it is entitled to summary judgment as to liability on its counterclaims
because there is no dispute over any of the elements of those claims other than damages, which it
contends should be submitted to a jury.  Alantra has moved for summary judgment on both
claims on the ground that Apex has failed to allege damages, an essential element of each claim.

For the purposes of the cross-motions, parties do not dispute any of the elements of either
claim other than damages.  And they do not dispute that Apex has not produced evidence of
damages other than a declaration from its CEO stating, "Apex already has been, and will
continue to be, damaged by Alantra's disclosure of Apex's confidential information, including
damage to its industry reputation, its competitive advantage in connection with the pursuit of
new business, and its current and future investment campaigns."  (Savage Decl. ¶ 10).[4]  Whether

---

[4] Apex has submitted an interrogatory response stating that a representative working with one of Apex's
competitors "informed Kent Savage that he had seen Apex's 'book,'" which Apex took to mean a document
containing confidential information prepared by Alantra.  Apex has not identified any further damages resulting
from this potential disclosure.  (Apex's Suppl. Resps. to Alantra's First Interrogs. No. 15).

Apex can proceed on its counterclaims therefore depends on whether there is a triable issue of fact as to the existence of damages.

### 1.    Breach of Contract Claim

"Proof of damages is an essential element of a claim for breach of contract under New York law." *Process Am. Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 141 (2d Cir. 2016).  "To establish actual damages, plaintiffs must come forward with evidence to establish the existence of actual damages that they suffered that were directly and proximately caused by [the] breach." *Zurich Am. Life Ins. Co. v. Nagel*, 2022 WL 759375, at *9 (S.D.N.Y. Mar. 14, 2022).  The damages "must be not merely speculative, possible, and imaginary, but they must be reasonably certain . . . ." *Tractebel Energy Mktg. Inc. v. AEP Power MKTG., Inc.*, 487 F.3d 89, 110 (2d Cir. 2007) (internal quotation marks, emphasis, and citation omitted).  Whether damages are certain concerns "the *fact* of damage, not the amount." *Id.*  Thus, for purposes of summary judgment, plaintiffs need not prove the exact amount of damages.  *Id.*

In addition, "nominal damages are always available in a breach of contract action even if a party cannot prove general or consequential damages." *Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*, 976 F.3d 239, 247 n.10 (2d Cir. 2020) (collecting cases).  For example, the Southern District of New York concluded that summary judgment was inappropriate where a defendant failed to return confidential information upon termination of his employment. *Zurich*, 2022 WL 759375, at *11 (applying New York law).  That was true despite the fact that "plaintiffs' evidence regarding actual damages [wa]s fairly nonspecific," at least "where plaintiffs ask[ed] for specific performance and injunctive relief as a remedy, and where nominal damages may [have been] available." *Id.*

Assuming for present purposes that the filing of the complaint and its appendices was a breach of Alantra's contractual obligations, and that Apex performed its obligations under the

19

contract, whether Apex has incurred actual damages as a result of the breach is a disputed issue

of material fact.  Apex has attested that its reputation and business prospects have been and

continue to be damaged by the disclosure of confidential information.  (*See* Savage Decl. ¶ 10).

The fact that it has not produced any evidence concerning the extent of damages at issue is not a

sufficient basis for granting summary judgment in favor of Alantra, particularly where nominal

damages and injunctive relief are available.  Because Apex has failed to identify a particular

transaction or business opportunity it has lost as a result of the disclosure of its confidential

information, however, summary judgment in favor of Apex is also not appropriate.  Damages is

an essential element of a claim for breach of contract, and Apex has yet to offer sufficient proof

as to that element.

Accordingly, the parties' cross-motions for summary judgment on the breach of contract

counterclaim will be denied.

### 2. Breach of Fiduciary Duty Claim

Under New York law, a "cause of action for breach of fiduciary duty which is merely

duplicative of a breach of contract claim cannot stand."  *William Kaufman Org., Ltd. v. Graham

& James LLP*, 703 N.Y.S.2d 439, 442 (App. Div. 2000).  *See also Catalyst Advisors, L.P. v.

Catalyst Advisors Invs. Glob. Inc.*, 2022 WL 1471033, at *13 (S.D.N.Y May 10, 2022)

(dismissing breach of fiduciary duty claim based upon improper utilization of confidential

information where it was "identical in substance to [plaintiff's] breach of contract claim").

Claims are duplicative where they "are premised upon the same facts and seek the same damages

for the alleged conduct."  *Northern Shipping Funds I, LLC v. Icon Cap. Corp.*, 921 F. Supp. 2d

94, 106 (S.D.N.Y. 2013) (dismissing claim for breach of fiduciary duty where alleged fiduciary

relationship arose from the language of the contract).[5]

Here, the substance of both claims is identical. The same actions—disclosing confidential information in a publicly-filed complaint and attaching the Engagement Letter—form the basis of both the breach-of-contract and breach-of-fiduciary-duty claims. (*See* Apex Countercls. ¶¶ 36-38, 45-47). And Apex does not identify separate harms resulting from each claim. (*Id.*; Apex's Mem. at 18, 20 (citing "damage to its industry reputation, its competitive advantage, and its current and future investment campaigns"). The claims are therefore duplicative, and the claim for breach of fiduciary duty will be dismissed.

Accordingly, Alantra's motion for summary judgment will be granted and Apex's motion for summary judgment will be denied as to Count 2 of the counterclaim.

## III. <u>Conclusion</u>

For the foregoing reasons, the motion of plaintiff Alantra LLC for summary judgment is GRANTED as to the counterclaim for breach of fiduciary duty, and otherwise DENIED. The motion of defendant Apex Industrial Technologies LLC for summary judgment is GRANTED as to the breach of contract claim, GRANTED in part to the extent that plaintiff is asserting a claim for unjust enrichment based on services provided in connection with the sale of assets by defendant to Fastenal Company, and otherwise DENIED.

---

[5] The District of Massachusetts has held that "a choice of law provision should apply to non-contract claims where the basic source of any duty owed by defendants to the plaintiff is derived from the contractual relationship," including claims for breach of fiduciary duty. *McAdams v. Massachusetts Mut. Life Ins. Co.*, 2002 WL 1067449, at *12 (D. Mass. May 15, 2002), *aff'd*, 391 F.3d 287 (1st Cir. 2004); *cf. Lambert v. Kysar*, 983 F.2d 1110, 1121–22 (1st Cir. 1993) ("[C]ontract-related tort claims involving the same operative facts as a parallel claim for breach of contract should be heard in the forum selected by the contracting parties."). Because the claims for breach of contract and breach of fiduciary duty derive from the confidentiality provisions in the Engagement Letter, and because the Engagement Letter provides for the application of New York law, the Court will apply New York law to both claims.

**So Ordered.**

                                            /s/  *F. Dennis Saylor IV*
                                            F. Dennis Saylor IV
Dated:  October 19, 2022                    Chief Judge, United States District Court